# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-2597

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| John C. Hetherington, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted:  December 12, 2000

Filed:  July 11, 2001

_____

Before McMILLIAN and JOHN R. GIBSON, Circuit Judges, and LAUGHREY,[1] District Judge.

_____

JOHN R. GIBSON, Circuit Judge.

John C. Hetherington appeals his conviction on two counts of wire fraud, one count of securities fraud, and one count of engaging in a monetary transaction in criminally derived property, arguing that the evidence does not support the jury's

_____

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri, sitting by designation.

verdict. He also argues that the district court[2] erred by admitting evidence of a state court civil judgment entered against him. Finally, he argues that the district court erred in sentencing because there was no evidence to support adjustments for his role in the offense and for his knowledge that money he received was proceeds of a specified unlawful activity and because the court failed to group the monetary transaction count with the fraud counts. We affirm the conviction and sentence.

In the fall of 1990, Hetherington met with Daniel Bubalo, Michael Wilcox, and several other members of the board of directors of O-Jay, Inc., a Minnesota corporation. At the time, Bubalo was president of the company and Wilcox was the director of marketing at the O-Jay orange juice manufacturing plant located in Lindstrom, Minnesota. Hetherington indicated that he was interested in becoming a board member. Six months after the meeting, Hetherington sent a letter to Bubalo, which identified Hetherington as the chairman of the board of directors of First Omni Financial Corporation. He proposed that O-Jay acquire a number of companies, among them Commercial Tire Warehouse, Incorporated. The board approved the acquisition of Commercial Tire. Hetherington raised $500,000 to $700,000 in California to make an initial investment in O-Jay, securing a place on the board. He became chairman of O-Jay's board in February 1992.

In May 1992, Wilcox took over operations at the Lindstrom plant. O-Jay was on shaky financial ground, and the plant eventually closed. The company had no assets and was producing no revenue. At some point, O-Jay filed for bankruptcy protection.

During this same time period, Hetherington proposed that O-Jay ship orange juice and other goods to Russia. In June 1992, Hetherington issued a press release that stated that O-Jay and Morgan Enterprises had entered into an agreement to ship orange

---

[2]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

-2-

juice by air to the Commonwealth of Independent States. The press release indicated that O-Jay was a diversified holding company with interests in juice production and wholesale tire distribution, a reference to Commercial Tire. Four months later, First Omni Financial issued a press release, which listed Hetherington as the media contact, that contained similar information about First Omni Financial's and O-Jay's dealings in the Ukraine. Several newspapers carried stories about the deal, and Hetherington faxed one such article to O-Jay entitled, "Local businessman seals trade deal with Ukrainian companies." The article stated that Hetherington would import $10 to $15 million of goods from the Ukraine per month and, in return, he would export fruit juices and used motor vehicles.

An O-Jay shareholders' meeting was called for the end of March 1993. One purpose of the meeting was to change the company's name to Omni International Trading, Inc. The night before the meeting, the board members met and Hetherington proposed a tender offer be made for the outstanding shares in the company and represented that he had the ability to fund the offer. The other board members were unanimously opposed to the proposal.

One of the shareholders, Daniel Koehler, recorded the shareholders' meeting on audiotape. At the meeting, Hetherington announced that the company had an agreement in place to ship goods to the Ukraine. He stated that O-Jay was going to do the shipping itself: "[W]e're gonna ship 'em over there on our airplanes, on our schedule, to our people, and it's all paid for." Someone at the meeting asked Hetherington if he was saying that the company owned its own airplanes, and he responded, "No, I said Omni Leasing owns their airplanes . . . . DC 8s and 747s." Hetherington said that Omni Computers, a subsidiary of First Omni Financial, had computers available to ship to Europe, that the first order was for 10,000 computers, and that O-Jay would profit. He said that his contracts called for $100 million of business per month. Someone at the meeting asked him when that would start, and he replied, "It's already started . . . . The money transactions are being done as we speak."

-3-

None of Hetherington's statements was true. At the meeting, Hetherington also announced that there was going to be a tender offer.

In May 1993, Omni's board members approved the tender offer they had previously opposed. Hetherington sent a tender offer statement to Omni that was sent to the shareholders. It offered $3.50 per share for up to twelve million shares if the shares were tendered to National City Bank, the escrow agent, by June 30, 1993. By the fall of 1993, National City Bank had not received any funding for the offer and withdrew as escrow agent, returning the shares to the shareholders. Wilcox informed the shareholders, at Hetherington's direction, that Omni would act as its own escrow agent and that shares should be sent to Omni. Omni missed all the deadlines it set for completion of the tender offer.

In the spring of 1994, with the tender offer still incomplete, Hetherington asked Wilcox, who had become president of the company, to "sit on" Omni's financial statements to prevent the shareholders from knowing the true state of affairs. At the time, Omni's financial situation was very poor.

By the middle of 1994, Omni had set up an answering machine to field shareholders' calls regarding the progress of the tender offer. The message was continually updated, promising investors that they would receive money shortly. The tender offer was never completed.

Additional investors purchased Omni stock in 1994, relying on outdated and false financial information; they were also told that the tender offer would go through very soon. Hetherington, who received over $360,000 over the course of his involvement in O-Jay/Omni, received several wire transfers from the company in the fall of 1994: $15,000 on October 12, $10,000 on October 14, and $2,000 on November 10. The source for this money was investor funds. In May 1995, Omni's

board discovered that the company had never actually acquired Commercial Tire. Under pressure, Hetherington resigned as chairman of the board.

The Securities and Exchange Commission began investigating Omni in 1995. Wilcox pled guilty to securities fraud, mail fraud, and conspiracy to commit securities and mail fraud. Bubalo pled guilty to securities fraud, mail fraud, engaging in a monetary transaction in criminally derived property, and conspiracy to commit securities and mail fraud. More than 400 investors lost all the money they invested in O-Jay/Omni, a total of about $4.8 million.

Counts I and II of the indictment charged Hetherington with wire fraud in violation of 18 U.S.C. § 1343 (1994). Count III charged him with securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff(a) (1994) and 17 C.F.R. § 240.10b-5 (2000). Finally, Count IV charged Hetherington with engaging in a monetary transaction in criminally derived property in violation of 18 U.S.C. § 1957 (1994). A jury found Hetherington guilty on all counts.

For purposes of sentencing Hetherington, the district court grouped Counts I, II, and III and considered them separately from Count IV. On the fraud counts, the court determined that the base offense level was 6 and added 13 levels for the amount of loss, 2 levels for more than minimal planning, 2 levels for role in the offense, and 2 levels for obstruction of justice, resulting in a total offense level of 25. On the monetary transaction count, the district court determined the base offense level was 17 and added 2 levels for the value of the funds, 2 levels for knowledge that the proceeds were from a specified unlawful activity, and 2 levels for role in the offense, resulting in a total offense level of 23. The court decided not to group Count IV with the other counts because it found that the monetary transaction count did not involve substantially the same harm as the fraud counts. The court then applied U.S.S.G. § 3D1.4 (1998) and added 2 levels to the higher offense level for a combined offense level of 27. Based on Hetherington's criminal history category of I, his sentencing range was 70 to 87 months.

See U.S.S.G. Ch. 5, Pt. A (1998). Hetherington received an 80-month sentence, which included concurrent and consecutive sentences of various lengths.

## I.

Hetherington challenges the sufficiency of the evidence to support his conviction on all counts. In reviewing the jury's verdict, we consider the evidence in the light most favorable to the government, give the government the benefit of all reasonable inferences, and reverse only if no reasonable jury could have found Hetherington guilty beyond a reasonable doubt. United States v. Sykes, 977 F.2d 1242, 1246-47 (8th Cir. 1992).

## A.

In challenging his conviction under 18 U.S.C. § 1957 for engaging in a monetary transaction in criminally derived property, Hetherington argues that there was no evidence he knew the $15,000 he received in October 1994 was criminally derived. He also argues that the government failed to trace the funds in the account from which Hetherington received the wire transfer, and thus there was no proof that the $15,000 was in fact derived from a specified unlawful activity.

Omni's only legitimate source of revenue, the orange juice production plant, closed in 1992. At the time Hetherington received the $15,000, Omni's only source of funds was shareholder money. Hetherington contends that Bubalo sometimes loaned money to the company, implying that the money he received may not have come from investors. FBI agent Christopher Lester testified, however, that the source of the funds for the wire transfer was investor money. Additionally, "[t]he government need not trace funds to prove a violation of § 1957." United States v. Pennington, 168 F.3d 1060, 1066 (8th Cir. 1999). Hetherington's involvement in the tender offer and the statements he made at the shareholders' meeting indicate that he was fully aware that

Omni's entire operation was based on deceit and, consequently, that he was aware that any funds he received were proceeds of this deceit. Hetherington directs us to his testimony before the SEC, which was admitted at trial, where he stated that he did not know the source of the money he received, but that it could have been investor money, Bubalo's money, or Bubalo's brother's money. This testimony is equivocal, at best, and the jury could have chosen not to believe it. A reasonable jury could find beyond a reasonable doubt that Hetherington knew that the $15,000 was proceeds of a criminal activity and that the money was actually derived from securities fraud.

**B.**

Hetherington argues that his convictions for wire fraud were not supported because there was no evidence that he transmitted or caused to be transmitted the two wire transfers at issue. Under the wire fraud statute, it is a crime to "transmit[] or cause[] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing" a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. "[A] defendant will be deemed to have 'caused' the use of . . . the interstate wires if the use was the reasonably foreseeable result of his actions." United States v. Wrehe, 628 F.2d 1079, 1085 (8th Cir. 1980).

On October 14, 1994, Wilcox wired $10,000 to Hetherington in care of Lawrence Wakefield. On November 10, 1994, Wilcox wired $2,000 to Hetherington in care of Lawrence Wakefield. Hetherington points to Wilcox's testimony that he made these wire transfers at Bubalo's direction. Bubalo testified, however, that he authorized the transfers in part because Hetherington indicated that he had financial needs. Wilcox also testified that Hetherington had instructed him to wire money to

Hetherington, using an account with Kristen Wakefield's name on it.[3]  Certainly, the transfers were a reasonably foreseeable result of Hetherington's actions.  A reasonable jury could find beyond a reasonable doubt that Hetherington caused the wire transmissions at issue.

## C.

Hetherington argues that there is no support for his securities fraud conviction because there was no evidence that he intended to defraud anyone.  "Fraudulent intent need not be proved directly and can be inferred from the facts and circumstances surrounding a defendant's actions."  United States v. Flynn, 196 F.3d 927, 929 (8th Cir. 1999).

When Hetherington announced the tender offer at the stockholders' meeting in March 1993, he made numerous misrepresentations, including that he had set up a trade relationship with people in the Ukraine, that he had entered into an agreement to ship goods to the Ukraine, that Omni Leasing owned airplanes that would be used for shipping, and that his contracts would result in $100 million of business per month. Hetherington claims that he was simply outlining plans for the future, but it is clear that he represented to the shareholders that this was Omni's present situation.  Hetherington was also involved in issuing false press releases that contained misrepresentations similar to those he made at the shareholders' meeting.  This evidence was more than sufficient for the jury to find beyond a reasonable doubt that Hetherington intended to defraud Omni's investors.

---

[3]Kristen Wakefield, Lawrence Wakefield's ex-wife and Hetherington's fiancee, was apparently named on Lawrence's account.

## II.

Hetherington argues that the district court erred by admitting evidence of a civil judgment entered against him in California because the evidence was unfairly prejudicial. We review a district court's ruling on the admissibility of evidence for abuse of discretion. United States v. Forcelle, 86 F.3d 838, 841 (8th Cir. 1996).

The California judgment was rendered in favor of Helen Troop and against Hetherington for breach of contract, money had, and fraud. The judgment stated that "there was no appearance by John Hetherington, in pro per." Other defendants in the case included Omni, First Omni Financial, Bubalo, and Wilcox. Omni and First Omni Financial were also found liable to Troop. The judgment neither describes Troop's allegations nor contains any recitation of the evidence. The only description of this civil case was through testimony, which revealed that Troop's husband, prior to his death, invested in O-Jay as part of Hetherington's initial investment in the company.

The district court admitted the judgment, relying on our decision in United States v. Sandow, 78 F.3d 388 (8th Cir. 1996), a case that involved the admission of evidence under Fed. R. Evid. 404(b), and concluding that Hetherington's situation was very similar. The court also concluded that the offenses from the civil case were blended or connected with the crimes for which Hetherington was being tried, which strikes us as being somewhat contradictory to its 404(b) conclusion.

In Sandow, the defendant was tried under two separate indictments, and we concluded that the admitted civil judgments were relevant to the defendant's motive for committing the crimes charged in one indictment, although we could not comprehend the government's argument concerning their relevance to the crimes charged in the other. 78 F.3d at 392. We held that it was harmless error to admit the evidence, if it was error, given the overwhelming evidence against the defendant. Id. First, we note that Sandow does not purport to create a bright-line rule that prior civil judgments are

-9-

admissible in a criminal case. Second, we cannot conclude that Hetherington's situation was similar to the situation presented in <u>Sandow</u> because the California civil judgment was not relevant to Hetherington's motive to commit the crimes with which he was charged.

The district court's other reason for admitting the judgment was the connection between it and the crimes for which Hetherington was on trial. We have previously held that evidence of other crimes is admissible when they are so connected with the offense for which the defendant is being tried "that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged." <u>United States v. Derring</u>, 592 F.2d 1003, 1007 (8th Cir. 1979) (quotations omitted). "When the other crimes evidence is so integrated, it is not extrinsic and therefore is not governed by Rule 404(b)." <u>United States v. Bass</u>, 794 F.2d 1305, 1312 (8th Cir. 1986). Although the district court concluded that the judgment was blended or connected with Hetherington's crimes in this case, it gave a 404(b) limiting instruction to the jury, instructing them that they could not use the evidence to decide whether Hetherington committed the crimes charged in the indictment, but that they could use it to decide whether Hetherington "had knowledge of fraudulent misrepresentations and intended to engage in a pattern of intentional deceit and misrepresentation."

We entertain some concern about the admission of the judgment because of the questionable applicability of <u>Sandow</u> and because the district court seems to have found that the judgment was both extrinsic and intrinsic evidence. Even if the district court erred, however, we conclude that the error was harmless. The court instructed the jury not to use the judgment to determine whether Hetherington was guilty of the crimes with which he was charged, and the government presented sufficient evidence to convict Hetherington on all counts.

### III.

Hetherington argues the district court committed several errors in sentencing him. We review the district court's findings of fact for clear error, and we review its application of the sentencing guidelines de novo. United States v. Moore, 245 F.3d 1023, 1025 (8th Cir. 2001).

### A.

The district court increased Hetherington's offense level for both the fraud counts and the monetary transaction count by two levels for his role in the offenses. See U.S.S.G. § 3B1.1(c) (1998). Hetherington argues that the evidence did not support these adjustments. "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." Id., comment. (n.2).

The district court found that the evidence established that Hetherington "gave direction to and approved conduct by Michael Wilcox that constituted part of the scheme to defraud." The district court also found that Hetherington "supervised Kristen Wakefield's involvement in engaging in a financial transaction in criminally-derived property by having the $15,000 wire-transferred to him in care of her ex-husband, Lawrence Wakefield."

These findings are not clearly erroneous. Wilcox testified that Hetherington asked him to delay issuing financial statements to the shareholders in 1994 until after the tender offer was completed. He also testified that he wired money to Kristen Wakefield at Hetherington's direction. Hetherington testified before the SEC that Wakefield received money that was intended for him and that she used it to pay current expenses and to reimburse herself for past expenses incurred on Hetherington's behalf.

-11-

The two-level adjustments for Hetherington's role in the offenses were fully supported by the evidence, and the court did not err by imposing them.

## B.

The district court increased Hetherington's offense level for the monetary transaction count by two levels pursuant to U.S.S.G. § 2S1.2(b)(1)(B) (1998). Hetherington argues that he had no knowledge that the funds he received were proceeds of a specified unlawful activity. The district court found that evidence established that Hetherington "was fully knowledgeable that Omni's tender offer, and even its entire operation, were based on fraud involving the purchase and sale of securities." The evidence we considered in Sections I(A) & (C) supports a conclusion that Hetherington knew that the funds he received were proceeds of securities fraud. The district court's finding is not clearly erroneous.

## C.

Finally, Hetherington argues that the district court should have grouped the monetary transaction count with the fraud counts under U.S.S.G. § 3D1.2(c) (1998). This section provides that counts involve substantially the same harm (and thus must be grouped together) "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." Although his argument is awkwardly phrased, we read it to say that Hetherington's knowledge that the funds were derived from securities fraud was treated as a specific offense characteristic of the monetary transaction count and embodied conduct from another count.

The government directs us to United States v. O'Kane, 155 F.3d 969 (8th Cir. 1998), and United States v. Lombardi, 5 F.3d 568 (1st Cir. 1993). In O'Kane, we held that the district court erred by grouping O'Kane's mail fraud count with his money

laundering count, stating that "none of the grouping rules properly apply to O'Kane's two counts of conviction." 155 F.3d at 974. Our analysis addressed only two of the grouping rules: sections 3D1.2(b) and 3D1.2(d). Id. at 973-74. In contrast, Hetherington relies on section 3D1.2(c).

We are persuaded by the First Circuit's opinion in Lombardi, however. Lombardi received a two-level increase to his money laundering offense level because he knew that the laundered funds were obtained through mail fraud. Lombardi, 5 F.3d at 570. He argued that section 3D1.2(c) required his money laundering count to be grouped with his conspiracy/mail fraud counts. Id. at 571. The court held that section 3D1.2(c) did not apply: "The 'conduct' embodied in the mail fraud counts is the various acts constituting the frauds, coupled with the requisite intent to deceive; the 'specific offense characteristic,' in U.S.S.G. § 2S1.2(b)(1)(B), is knowledge that the funds being laundered are the proceeds of a mail fraud." Id.; see also United States v. Smith, 13 F.3d 1421, 1428-29 (10th Cir. 1994). In essence, Hetherington's knowledge of the origin of the funds is not conduct embodied in the securities fraud count. But see United States v. Salter, 241 F.3d 392, 395 (5th Cir. 2001) (drug conspiracy count should have been grouped with money laundering count under section 3D1.2(c) because money laundering count was enhanced for defendant's knowledge that funds were proceeds of unlawful activity involving drug distribution); United States v. Bartley, 230 F.3d 667, 670-73 (4th Cir. 2000) (drug conspiracy and money laundering conspiracy counts should have been grouped under section 3D1.2(c) where defendant's money laundering conspiracy count enhanced for knowledge that laundered funds were drug proceeds and indictment charged that drug conspiracy involved laundering drug proceeds to facilitate illegal distribution); United States v. Rice, 185 F.3d 326, 328-29 (5th Cir. 1999) (section 3D1.2(c) requires grouping of money laundering count with drug counts where defendant's money laundering offense level was enhanced because he knew money was derived from drug distribution). The district court did not err by refusing to group the monetary transaction count with the fraud counts.

-13-

**IV.**

We have considered the additional arguments raised by Hetherington in his pro se supplemental reply brief and conclude that they are without merit. We affirm the judgment and sentence of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.